First matter is Fugueys, is that correct? Fugueys. Yes. Versus Southwest Financial Services. When you're ready, sir. Good morning. May it please the court, Jim Francis for the appellant, Marie Fuges. I request... Wait, now when... I just asked you if I was pronouncing it correctly, you said yes. You don't have to say yes to every question I ask you. Because you just said Fugues, I said Fugueys. No, I thought I said, Your Honor, Fuges. Oh, I'm sorry. Okay, all right. But that's good. See, you're doing better. You told me I was wrong. Okay. Thank you, Your Honor. I request three minutes for rebuttal. Okay. We seek reversal of the district court's November 22, 2011, memorandum order granting summary judgment to the appellee Southwest Financial Services under the Fair Credit Reporting Act. Given the limited time, we will rest our arguments concerning the record evidence overlooked by the district court and the court's application of Safeco on the briefing. Instead, our argument today focuses exclusively upon the district court's erroneous ruling that Southwest had a reasonable reading of the FCRA, which justified a dismissal of Ms. Fuges' willfulness claim. So that really turns on whether or not the FRCA applies to Southwest. Obviously, if it doesn't apply, it's a moot question. That's correct, Your Honor. If you can help me out with that, why does it apply? And if it applies, why wouldn't it apply to every title company in the world? That's a terrific question, Your Honor. At least in the U.S. One that I anticipated. Given the breadth and scope of the FCRA, which is evident and extraordinary, as this court noted just two years ago in Cortez v. TransUnion, and the contents and the use of Southwest's report, the report that it sold about Ms. Fuges and other Philadelphians, there is no reasonable reading of the FCRA, which would insulate it from a willfulness finding or from coverage. Well, let's look at the definition section and help me out with that. What does it apply to? Under 1681A, how does it define consumer report? Well, the way it defines consumer report, Your Honor, is a way that supports our position, which is any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit. A consumer, right? That's the point that your opponents focus on and say, this is not on a consumer. It's on a piece of property. What's your response to that? Well, our response, Your Honor, number one is that it's belied by their own testimony. Their corporate executives testified at that position that the report was about her, that she was the subject of the report. That's detailed in our briefing. Well, that's going to be true of any piece of property. I mean, people don't do, generally, title searches on land that nobody claims. They're out there looking at it because it belongs to somebody. So, in a sense, in the broadest sense, every title search is on a person because some person is claiming it. So, it can't just be that broad, can it? Well, it wouldn't cover title searches and title reports in the way that both Chief Judge McKee and Judge Jordan, that you've mentioned, because title searches are not used in connection with assessing the eligibility of somebody for credit or insurance. And one of the things that is the hallmark of an FCRA consumer report is its use. If it is used to determine eligibility for credit or insurance, that can take place. Well, they say, we made people promise this was just going to be used for looking at the property. And, you know, what are we to do if they go ahead and use it in a way we don't anticipate? But that's belied by this record entirely. First, it's belied by the district court's finding. The district court agreed, actually, that as a result of the information contained in the Southwest report, Mrs. Fugis was denied her home equity credit application. Let's assume for the sake of argument that they had written something really clear that said, we understand that you just want to know about the property. Is the property encumbered? We're going to give you just information about whether the property is encumbered, and you're not going to use this for anything except understanding that. Do we have an understanding of that? And they said, yes, that's a fair understanding. And then they went ahead and used it in the way that you think is bad. Would they be liable for that? Well, I would say they would be liable if based upon that. So there's nothing a company could do that just wanted to search property and report on the property to defend itself if people are going to use the product of their search in a way that they specifically tell people don't and, in fact, people promise not to. They're still going to get hit with the FCRA under your reading of it. Is that right? Well, not necessarily, because as the definition provides after what I was beginning to read, it's a consumer report if it's used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility. So if the title company, as Your Honor just posed, has no knowledge whatsoever that it's going to be used in connection with eligibility and, in fact, it is not used for eligibility, then I think there might be a defense there. Well, when you say and not used for, I mean, that's the point. I don't want to speak for anybody else. I'm trying to understand what the limits of your argument are. But your argument seems to be even if something is focused on property and even if the property report is one that the producer of it extracts a promise from the recipient that that won't be used in credit or insurance underwriting, if it's used that way, tough for them. They still have FCRA responsibilities, and they'll be liable for statutory damages and may be troubled. Well, I don't know that I'm saying that, Your Honor, because that's not this case. A case that was where a report is exclusively about property would not be covered. This case is very clear on the facts and evidence of this case. This report was about her. It was titled In Re Marie Fugis. It had delinquency information about her, not about the property. It had judgment information about somebody else that they thought was her deceased husband when it wasn't. Well, but they explained that. It was because that judgment was relevant to whether or not the property that was collateral was encumbered because the names are the same, the address was the same, and it was her son. Well, it would not because unless the judgment was in her name, it would not have attached to the property. It was not even about her. It was not even a judgment about her. Well, wait. You could have a judgment against someone who is a joint owner in the property. That's going to attach to the property. You may not be able to realize it. It depends on who the predecessor is to whom. But if the judgment is against the co-owner of the property, that's going to encumber the property. That's correct, Your Honor. But in this case, that he was not the co-owner of the property. At one point. There had been a Robert, not the son, but the father had been the owner of the property. He conveyed it. But if there had been a cloud on his conveyance, that would affect the property. Well, that's possible, but that's not this case. It was about her son. So you're saying you would concede that the FCRA would not apply if my daughter applies for a loan, and I say I'll put up my property as collateral for that loan, and the company does, Southwest does a current property owner's report on my property, then the Fair Credit Reporting Act does not apply. If it doesn't impact your eligibility to get credit, the answer would be no, it would not apply. That is the hallmark, right, of an FCRA report. Eligibility to get credit. I hate to go back to the same thing, but won't any title search fit that broad statement? Because you could find a defect in title and say, well, you don't have a good title here. We're not going to give you a loan based on a defective title. The answer is no. And the reason is, as I keep saying, or I'm trying to convey, and as this court recognized, I think, in a separate context in the Cortez matter, that what determines whether or not a report is a consumer report is how it's used. It could contain all the information at once, but if it's never used for credit eligibility purposes or insurance or employment, it is not covered. So how PNC used it in this case is critical to you, is that right? No question about it. Okay. So PNC said, if I'm correct, the exact language was that they weren't going to give her a they had not received, quote, verification that real estate taxes on the collateral property are paid, close quote. Doesn't that sound like a statement that the Southwest report may have raised a concern in their mind, but the Southwest report was about the collateral property? But that's not the record here, Your Honor. In fact, the district court found that as a result of the Southwest report, she was denied the home equity line. So that's not this case. This case is very clear, that as a result of the information reported about Ms. Fugis, Ms. reported that she had a tax lien. As a result of that, she was not eligible for her home equity line of credit. That is a clear consumer report. What about a telephone bill? Landlords routinely check histories of telephone payments, and if a customer or potential tenant shows a history of delinquencies in paying the telephone bill, that's going to indicate, perhaps to the landlord, this is not someone who's creditworthy, I don't want to rent to them. Would a telephone bill, under your broad definition, would that fall under the FICA? A telephone bill, if it included delinquency about that consumer, in other words, a statement that impacted the consumer's creditworthiness. So if a landlord asks for a printout from AT&T or T-Mobile or whomever, assuming you could get it, I mean, probably couldn't get it, but assuming privacy laws aside, show me a printout of the monthly balances of this potential tenant for the last year. You're saying that becomes a subject to the FICA? If that report pertains to that consumer's paying habits, the answer is yes. Well, it clearly would. Well, then if it does, it would apply, and it's very clear. That's the key, you said paying habits, which is the real point of contention. Let's assume that there were two, an applicant for credit owned two properties, one, say, a $50,000 home, heavily encumbered with liens, mechanics liens, municipal liens, all kinds of liens, and they happened to have another home at Malibu Beach, and it was estimated at being worth $10 million, squeaky clean, nothing encumbering the title at all, no liens, no judgments. My guess is that person's going to get credit, even though according to your definition, the first report on the $30,000 and $50,000 home that's heavily encumbered would suggest this person's not credit worthy. The bank isn't going to care because they've got $5 million worth of collateral in the beach home. Doesn't that undermine, assuming that's true and that seems like a logical scenario, doesn't that show that the title report here, the property report, is really something other than credit worthiness? It goes to whether or not the bank has enough collateral to be able to realize a loan is somebody's fault. I don't think so, Your Honor, for a couple of reasons. Number one, the FCRA language is very clear that a report which has more than one use, so, for example, if the report contains property information but also contains information about that consumer's paying habits, if the report in whole or in part pertains to that consumer, that's the language. Congress specifically used the language in whole or in part. It didn't say... Well, then you've got to help us with how to cabin what you're saying because unless... You know, on the one hand, I hear you saying that there's, you know, title companies aren't going to get hit with this and then you use this language about paying habits. The hypothetical posit by Chief Judge McKee has a person whose horrible habits are maybe reflected in tons of liens on one of the pieces of property and a title search should show it. Just a plain old, not their Southwest specialty thing, but a plain old title search shows all these liens. You're saying that under your logic, why are they not swept into FCRA? Well, again, if it's a title search, which is used in connection with a consumer application for credit, which is normally not the case, right? So a typical title search is on a seller. The seller's not applying for credit. That transaction is not covered. Oh, no. I mean, I can't buy my property if I don't have a clean title report. I pay for the title report as the buyer. But the title report is about the seller. And the seller's... Title report's about the property. Or it's about the property, but if it has information about that seller, that would still not be covered because that seller's not applying for credit. The FCRA is very clear and the case law is very clear. What about a situation where you've got someone where I think they make this argument and agrees? The pledger of a piece of collateral is not the loan applicant and they get a property report on the property that is being pledged by X. But A is applying for the loan and putting up X's property as collateral. Now, in that scenario, the property report would not fall under the FRCA, would it? No, it would not because, again, that person is not applying for credit, insurance, or employment. And why it's consistent with the FCRA is the FCRA is basically very simple. It wants to guarantee that if information is going to be sold about somebody that could impact their ability to get credit, insurance, or a job, things that are important, the person has the ability to get that information and see it and dispute it. That's it. Nobody's disputing that the FCRA covers important stuff, but stick with the hypothetical I'm trying to get you to answer, which is take it away from the seller-buyer thing. This person with the horrible habits, who's encumbered their one home but has the beach house free and clear, is applying for yet another line of credit on the encumbered property. And a plain old title search is done. In your view of the world, a property search, a title search, in that circumstance revealing all the liens and all the problems, is covered by the FCRA and the title searching company that gives that report is a credit reporting agency because the banker might look at it and say, there's not enough collateral here. Look at all these liens. Is that right? If that report has information about that consumer and there's evidence that it's about that consumer. So there's no limit then to what you're asking to be swept into the FCRA. Really, is there? Title searching is not off limits here. It's in it as long as the person who's getting the search is the one applying for credit in your view of it, right? Well, only if it meets the same factors that this report did, which it had information about her, independent of the property. Property taxes aren't independent of the property. It's not. But the testimony in our case was that in addition to doing a search on the property address, they also did a search on her name separately. And that search revealed these delinquencies and revealed this other information. If that's the case and that information is then used to determine credit eligibility, it is covered. So I think it's a case-by-case basis. What about the Dodd-Frank exclusion from the catch-all? Does that undermine the argument at all? Well, as we pointed out, I don't think it undermines the argument at all. In fact, if anything, Dodd-Frank supports our position because, number one, it says nothing about amending the FCRA or the FCRA's definition of consumer report or consumer reporting agency. Number two, even if applicable, the Dodd-Frank would support our view because the report at issue here in Southwest Activities are used in connection with the offering of a consumer financial product or service, and therefore they're covered. They are not in the carve-out to the catch-all. They are within the definition of a product used in connection with the offering of a consumer financial product or service. It's very clear here. This was used in connection with. Can you help me one more thing? You reserved some time, so we'll hear from you again, but the issue of the files. Your opponents make a big issue out of the fact that the FRCA and credit companies are aimed at those entities that maintain files on persons, and the thing we're concerned about here really is not maintain a file on a consumer, to use that term, but doesn't even really maintain a file on the property. It just goes out and aggregates data that's publicly available for a particular piece of property, not using a Social Security number, which they point out, but an address. Does that at all, how do you respond to that? The fact that they don't maintain files does not impact coverage for a couple basic reasons. Number one, employment background checking companies all the time. They don't retain files. When a consumer applies for a job, employment background companies, they go and obtain public record information on that consumer and deliver it to the company that's asking for it. They don't maintain a file of that data. I'm not sure. Give me an example of something by employment background. I'm not sure that would be a consumer reporting agency. What kind of company are you referring to? LexisNexis, HireRight, any of the big, I mean, there are plenty of cases cited. The FCRA clearly covers employment background companies, and there are many cases, and I'd be happy to submit several more. Google, would Google be one? I don't know that Google does background checks in connection with jobs. Google does everything. Well, I agree. The type of the name, all kinds of stuff comes up. I'm not aware of Google performing background searches in connection with jobs. But clearly you'd admit that if, well, I shouldn't give away anything. I was just part of a very high-level search for president of the university, and it started with, that wasn't for credit though, but it started with a Google search, and a lot of the stuff that pops up arguably would be relevant to that person's eligibility for credit. Well, let me also answer, I guess, the better place to start is the statute, right? The statutory definitions of a consumer reporting agency, consumer report, don't require the maintenance of a file in order for someone to be covered or a company to be covered. In addition, there are plenty of other companies which are acknowledged CRAs, such as resellers, right? They don't have their own files. There's no question they're covered. So the mere maintenance of files or the lack of maintenance of files doesn't impact coverage. It may impact a claim for Section 1681G that they didn't provide the consumer with their full file, but it doesn't affect coverage. Thank you very much. Mr. May? Thank you, Your Honor. It's got me thinking. Frankly, I have not discussed it with my colleagues, but coming into this thing, it seemed to me that your argument on your brief was a very strong argument. Frankly, Mr. Francis, it got me thinking about this. I'm not sure your position is as slam dunk as I thought it was. Well, first, if it please the Court, I am Darrell May for the defendant, Southwest. Your Honor, it is a slam dunk, and Mr. Francis is a very fine lawyer and has used his time wisely to try to get you to think that it's not a slam dunk. But, in fact, it is. Why don't you start with this? The point that Mr. Francis made and which has been bothering me a little bit is, for a company that says it's just about the property, we're just out there looking at the property, they did two things which weren't just about the property. They went out and they found tax delinquencies by searching her name because there was no tax lien on the property, right? And they went out and they found a judgment against her son, which was not a lien against the property. They had to go out searching against the name Fugis to find that. So if it's all just about the property, how come they're out there searching on the name Fugis and adding that to their report? Well, the way that you find... I think when you are delinquent in your taxes with the city of Philadelphia, it is against the property. That property, if it were to go to sale, the city of Philadelphia would have first priority. So it is against the property. Do they not have to file anything with respect to the property? I don't believe so, Your Honor. So if you're out searching for tax delinquencies in the name of the person, is it fair to say that you're just thinking about the property? Aren't you actually out there searching in the name of a person about that person? Well, let's look at the lien situation, the judgment, because I think that actually illustrates everything. And here, yes, there was this situation on the typo between E and W. But let's assume that that had been the father, the deceased husband, actually, who owned the property and conveyed the property to the wife, not for good consideration sale, so that any judgments against the father, against the husband, pass on to the property. They're not extinguished by any sale, because it was just a sale for a dollar. So in that case, if Ms. Fugis defaults on her personal obligation, and there comes a time when you need to then sell the collateral, that lien would be a prior lien, and PNC would not have the title that it thought it had. How does that help you? Because that still goes to, that's one of the things that the bank is going to take into consideration in considering Ms. Fugis' credit worthiness. No, Your Honor. And this is an important point. Let me just start with this. Frankly, we all, I think it's safe to say, learned in law school that there's two components to a secured loan. There's the in personam obligation of the debtor, and there's the in rem pledge of property. Those are two distinct things. There is a credit report that is issued on Ms. Fugis in this transaction. It is a real credit report. That's what PNC looks at to determine whether she's credit worthy, personally credit worthy. The level of the in rem obligation, though, clearly spills over and impacts the credit decision on the in rem, on the in personam obligation. No, it impacts the credit. Look, it impacts the credit decision. Otherwise, why ask for a collateral? If you're saying, if they're that separate, why ask for a collateral because you're just asking, you're worried about Ms. Fugis. There's a spill over there, and I'm not sure how you can deny it. I'm not sure it hurts you, but it's there. Let me be clear. It does impact the credit decision. It impacts whether a loan is going to be issued, because you're not going to issue a secured loan unless you have clear marketable title to the collateral. So it clearly impacts whether a loan is going to be issued. It doesn't impact the credit worthiness of the person, the individual. The very point of a secured loan is the assumption that at some point it may turn out that this individual was not credit worthy. I mean, if you can assume that there will always be, just because the credit score is a great credit score and the person is credit worthy, if you assume that you're always going to get paid on your loan, you're never going to need security. The district court, in this case, didn't decide whether the FCRA applies to Southwest activities in this case, but simply decided that willfulness couldn't be shown. Don't we first need to decide whether or not FCRA applies here before we get to willfulness? It's not necessary, Your Honor. No. I mean, on this score, there's no question. The only thing you need to decide in terms of the coverage issue is whether FCRA is so elusively clear that a title report is covered, that there's coverage. That's true in a sense, but wouldn't we end up with, this is like the qualified immunity conundrum in Saussure versus Katz, right? What you seem to be suggesting is that the district court's approach is okay and you don't have to worry whether Southwest is actually violating FCRA because they're not violating it so badly that you could call it willful. And assume that's true, and we said just that, the way the district court said. Wouldn't we be sanctioning a circumstance where, or just giving a pass to Southwest to keep violating FCRA? No. Why not? If we posit the hypothetical, sir, that you are in violation, your client's violating FCRA, but just not willfully. If we decline to answer the question, then what's to prevent you from just staying out there violating FCRA? Well, first of all, two responses. Number one, this is a reasonable reading issue under state code. So you're not saying that it violated. You're saying we're not going to decide at this time whether it's subject to FCRA. Precisely. And you're not answering the question I put to you, which is assume there is a violation and we take the approach you're asking us to, don't we leave Southwest and all the other players in that sub-market, whatever it is, in violation of FCRA? If you assume that there's a violation, yes. But two things. Remember, Your Honor, the reason why we're here without needing to decide the coverage issue is because Ms. Fugis suffered no harm from this. Zero. Nothing. Well, it's because the negligence claim was abandoned also. Well, they abandoned the negligence because she suffered no harm. This idea that they abandoned negligence to be able to do a class, I mean, if that were the reason, it would have been pled this way from the word go. I mean, there were three complaints in this case. I mean, it was only when she testified that she got exactly what she wanted from PNC. And when she testified that when I said, did you call Southwest to get this error about the tax corrected, you said no, somebody else would get ahead of you. But stick with me, Mr. May. I think we all understand your position on that. I'm trying to get you to help us understand how we would write this. Let's say we wanted to agree with you. We looked at all this and we said, you know what? We think there's nice folks at Southwest are right. There's no willful violation here. But we are troubled by the way they've read FCRA. There's a real problem there. Now, your proposal, I think, and perhaps the proposal of the amicus is, don't worry about that. Pay no attention to that violation behind the curtain, if there is one. If we're writing this, do we have some obligation to address the violation? Or is it okay for us to leave potential violations happening on a daily basis out there because it's easier for us not to look at it? I think it's within the discretion of the court. I think that what Judge Davis did is supported by other courts. I think two justices of the Supreme Court in Safeco said there's no reason to actually reach the question of what the ultimate answer is on this, whether it was an increase, et cetera. The other justices went ahead and decided. I think it's possible to do it either way. You could certainly say that we read FCRA differently than Southwest, but it's not so collusively clear that you can make out a willfulness claim. Therefore, we're going to decide that title reports are subject to FCRA, but this one isn't because it's the first time anyone in the country has ever suggested that, and therefore there's no willfulness claim. You could do that. Or you could do what Judge Davis did. But I think that's a good segue into my next point. There's really two fundamental points here. This vast expansion of FCRA is predicated on a very fundamental point, which is troubling the court. So let me address it, particularly Judge McKay, I think he pointed this out, which is there's no question, people own properties. I mean, a business can own property. We'll put that aside. People own properties. And not only that, judgments and liens get attached to properties because of things that people do. So there's no question about that. So if I go out and I own a property and a judgment is entered against me, and I haven't paid that judgment off, then yes, what I did personally will affect the property. But that's been the very essence of title searches since time immemorial. Title searches since time immemorial have done searches against the individuals and not just against the chain of title. Is that what you're asserting? They've done searches for judgments. And judgments are entered against a property once it's a judgment against the owner of the property. Judgment liens, right? That's what I'm talking about, Your Honor. That's what I'm talking about. And that's all that's in this report. Really? Well, there was an error in terms of the son, but if the son had been the prior owner of the property, that judgment against him would absolutely have attached to his property. The question is why did they go out looking for, because in your brief you make a big issue distinguishing Berlanga and Ladner, that in this kind of report you're only looking at the property, all that's necessary is the address. In the consumer reporting context, the search is done on the Social Security number. But the record here is that they actually looked for information by name, not just by address. And that, at least that's what is troubling me. If what you're saying is true about the nature of these reports in general, this report may fall outside those parameters, because here they did something that you're saying is not characteristic to the kind of report. Your Honor, there's no evidence that these title searchers did anything different than any title searcher anywhere in Pennsylvania. That's just not the case. So you're saying title searchers generally look by name? That's how you find judgment liens against the property. That's the process that you go about doing it. Do they generally look by name? Yeah. The testimony was clear that this is what title searchers do, whether it's a full title search in connection with a property, with a title insurance policy, or this. This is a title search on this property. So they generally do do that, including a search by name. That was the testimony. And, Your Honor— Which is very inconsistent with the argument in the brief, where you're saying all that's necessary is the address. You just told me that they do look routinely by name, not just by address. Well, I think the testimony is that they look at the address to find the owner of the property. They look at the address to find the owner of the property, and then they look up the owner in the judgment index to make sure there's no judgment lien against the property that attaches to— against the owner that attaches to the property. I believe that was the process that was testified to. First, you look up the owner of the property by virtue of the property address, and then you find who the owners are. And if it's not a good sale, you go back to the prior good sale and see whatever judgment liens attached to the property based on that. But the intent is always only to look at what judgment liens against the property. For example, if the judgment had been paid, a title report, a regular Big Three title report, will show paid judgments. It was paid six months ago. It'll still show somebody got a judgment against them, and it took them a long time to pay.  I mean, if you look at the title— Can you explain to me how this report that was prepared by Southwest does not constitute information bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used as a factor in establishing the consumer's eligibility for credit? Because, number one, Your Honor, there is a credit report run on her— I'm just asking about the Southwest report. How does that not serve as a factor in establishing her eligibility for credit? To the extent that any judgment against a person that becomes a lien on the property reflects on that person, then that is true. But that is true for any title report. Full title report, short title report, it's true for anything. If there's a judgment against me, and I own the property, and it is attached as a lien on the property, yes, then that you can show. But it's not used for the credit worthiness of the borrower. You know, the property, what you just talked about, though, goes to the history of the property and the seller, not necessarily the buyer. It might impact— Not in a refinance. Let me make that point. I don't have much time. If I could make that point. Okay. Plaintiffs have misunderstood from day one what is at stake here, and what is at stake is nothing less than a restructuring of the industry, Your Honor. You can't do title reports subject to the Fair Credit Reporting Act. For one thing, a title report has to be on the individual applicant for credit. That's in the act. Here, if somebody else is pledging the property, it's got to be on somebody else. Well, but if you're right about that, the sweeping impact that a loss fee would have, and it seems to me that's an argument you don't make to us, you make to those solemn and very venerable individuals down in Washington, D.C., who wisely decide public policy. Your Honor, for decades the Fair Credit Reporting Act has been in existence. There have been thousands of decisions. No one has ever suggested before that a title report is subject to the Fair Credit Reporting Act. It relates to the property. But let me make this point clear. Plaintiffs have never understood the impact. Millions and millions and millions of people refinance their homes every year. When you refinance, there's no seller and there's no buyer. Somebody is coming in to say that we're doing a title report on your property in connection with a refinancing transaction. The borrower needs to know that it has clear and marketable title and that there's no unknown liens in it. What's so horrible about applying FCRA to that scenario? Well, for one thing, if there's a judgment that somebody's been sitting on for 10 years because they figure that eventually the property is going to be sold when the person retires or dies, which frequently happens, you can't report that under FCRA. It limits judgments, even open judgments, to seven years. For another thing, FCRA says you have to report on the person for the individual applicant for credit. Does the existence of RESPA, of the Real Estate Settlement Act, that is Congress's regulating of title searches through that mechanism, should that weigh in our thinking at all that Congress has done something to regulate that piece of the business? No, to be fair, Your Honor, that has to do with pricing. This doesn't have to do with the pricing. This has to do with, in American history, there's always been title searches to make sure that if I'm going to take your... In fact, title searches, long predate credit searches, where there's these big files that people maintain and instantaneously, you're at a shopping center and somebody wants you to get a credit card and they can run your credit score in three seconds. That's not what this is. They send the person to the courthouse to look up liens and judgments that affect the property. That's been done for decades. It's been done for over a decade. So when Congress passed FCRA, since that time, there's never been a single court, there's never been a single FTC, even staff opinion, that suggests that a title report is subject to the Fair Credit Reporting Act. I think that tells you something. Now, there's never been a company that is in this business that subjects itself to the title report. We know that because the plaintiff, when they try to suggest that there are companies that do title reports, they gave you some website addresses. And we printed them out, but the court wanted hard copies. I urge you to click on those. I urge you. Those are their best two examples of cases in which somebody supposedly in the business that Southwest is in subjects itself to a credit card. They are tri-merge reports. They are an Uber credit report. They take Experian and the other two big three credit reports and combine them into one. And then they threw in a little additional information about a property, and that's how they said that they were property reports. There is an industry, and by the way, Your Honor had used the term an old-fashioned kind of credit report or something. I forget exactly. Ladner makes clear, and we don't have to introduce Ladner into evidence to use a treatise that's been cited by this court and the Pennsylvania Supreme Court countless times. They aren't simply title reports. It's just that in a second mortgage loan like Ms. Hughes just wanted, the lender is willing to accept greater risk. It's willing to accept the fact that if I don't go back three generations of owners, maybe I'm going to miss stuff, but it's the last money at stake. I'm the second lender, so I'm just going to take that risk. But it is simply a title report, and there is no distinction. If this court were to hold that this report is subject to a that this report is subject, then any title report is subject to the Fair Credit Reporting Act. And the fact that it's this business about sellers, I mean, refinancings are clearly exactly the sort of situation we have here in which the owner of the title seeks a loan, and the lender is not going to give a loan unless a title report shows a good and marketable title. But again, on the in personam obligation, my personal obligation to repay, that a regular credit report is done, which is not everything. Payment history, slow pay, good pay, credit scores, none of that. I urge the court to see if any of that. When you look at this report, it's about the deed book. It's about the volume and deed book of where the lien appears. So how you get to that volume and deed, that volume in the books, you may have to look on names once you get the property owner's address, but you ultimately end up with the volume and page of the lien, because that's all, you look at this report, it's concerned with an encumbrance on the title. And just the final thing I'll say, because I know I'm over my time and I appreciate the court's indulgence, that the plaintiff spends many, many pages in her brief coming up with arguments about Safeco and the reasonable reading, and you had to have a reasonable reading ahead of time, and your subjective intent, and the way you read the statute, that is completely antithetical to the law of this circuit, as established in the Hilfiger case, 671 F3rd, 377. There is a paragraph on those pages, 377, 78, that are exactly the opposite of what plaintiffs argue. So at the end of the day, I don't think it's necessary to decide the coverage issue, but if the court wants to, it can. But the one thing that is absolutely clear here is that this statute, FICRA, is not pollutedly clear that a title company, a search, that has never, ever been subject to FICRA, and there is no argument to the contrary, obviously no court opinion on it, no nothing, under Safeco, there absolutely cannot be a finding of wilfulness. Thank you very much. Thank you, Your Honor. Your Honor, let me ask this, and I think that your opponent was referring to footnote 11 in your brief, where you cite a number of instances of entities that you say clearly admit that they're subject to FICRA. Of those, what is the strongest, and maybe you don't want to select it that way, but if you don't, that's fine, where is the strongest case for one of those clearly being under FICRA? Well, the strongest case is that Which one is what I'm asking? The Philbin versus TransUnion. I understand the case, but which one of those websites are you suggesting brings home the point the strongest? The website would be any websites which refer to mortgage reporting services. So remember, you've got Kroll, Factual Data, LandSafe, of those, is the one that makes your point more than any others? Not of that list. I think the case that makes our point is Philbin, which says that tax liens are covered FCRA information when they're reported in connection with credit eligibility. That's this circuit's decision. That's directly on point. So because tax liens are of interest when people are developing a consumer report and also of interest when they're developing a title report, that makes title reports consumer reports? Well, again, it depends on what you mean by title report. I think one of the things that, as we pointed out in the briefing, that where the Southwest has gone awry here is establishing or trying to argue that there is evidence that their report is a title report. In fact, if you look at the page at the bottom, it says this report contains information from the public records and is not to be construed as an opinion of title, title guarantee, or title insurance policy. They've never said that it's a full title report and one would expect them in a defensive mode to make that clear. But I'd be very interested in your response to something Mr. May said. He said if you three gentlemen up there decide that you're going to say FCRA applies to reports like this, what you're really going to be saying is that FCRA is going to override the practice of title searches that's gone on since time immemorial. And not only will you upend an industry, you will make it impossible for people to do proper title searches because under FCRA they can't report liens that are more than seven years old. So you'll be doing not just a bad thing to the nice title searchers of this land, you'll also be undermining the capacity of people to make rational business decisions because FCRA will prevent information from getting into title searches. I'm interested in your response to that line of argument. Yes, Your Honor. The first is that Mr. May was wrong. The FCRA permits the reporting of judgments as long as the statute of limitations permits. So he was incorrect about that statement. Okay, well then take it on your terms. Assume the statute had run. But there are other, does that mean that there's just nothing to do with that particular judgment that might be of significance to the title? Well, no. Again, I think if the report, again, there's no evidence that the report at issue here, and there was no record made of the district court, that the report at issue here is similar at all to the title reports that are run. There's just no evidence of that. That's not being responsive to my question, and we've got limited time. So I really want you to answer the specific question, is he right or is he wrong that applying FCRA under circumstances to a title search will make it so that standard title searching protocols can no longer be followed? I don't think that's correct. Because? Because many companies have reported tax lien and judgment information in connection with other types of situations, whether it's a job, whether it's a credit application, or whether it's insurance. And all they need to do is they comply by allowing the consumer to have a mechanism to see that report and dispute any inaccuracies. Are they in violation of FCRA if they report a judgment that's more than seven years old? Well, it wouldn't be, because as I said, Your Honor, the judgment itself may be reported under the Fair Credit Reporting Act for up to the statute of limitations. So it's not bound by that. What's the statute of limitations on enforcing the judgment? Well, it would depend on what the state is, depend on what each state's statute of limitations was. But, again, I think to go back to Chief Judge McKee's position here, the FCRA is very clear that it was designed to cover reports like that. If it was so clear, why are we, what are we, more than, how many decades are we into the FCRA? And nobody's been able to present us with a case like this, and your opponents say what they're asking for is unprecedented. So if it's really so clear, I mean, I don't mean to denigrate you or anybody else, but how come nobody thought of it before? I'll tell you why. Because consumers aren't giving copies of the reports, and they don't see it, and they don't know. So they don't come to me. So this is the first time, okay. And that's the reality. This report was confidential. Consumers don't see it. Ms. Fugis, because she went back over and over and over again and asked for a copy of it and demanded PNC give it to her, she saw it. That's when she saw it. That's the accuracy. That's the first time she called. That is a complete fabrication, as we pointed out. If you look at her interrogatory answers and her testimony, she had at least five separate interactions with PNC Bank. She went to the taxing office here in Philadelphia. She got a copy from them and said, I'm up to date. What's the problem? And even though she could prove that Philadelphia wasn't saying that she was delinquent in her taxes, Southwest was. That is the crux of why this is an FCRA case. Because the very thing that was used to deny her was something that was inaccurate, that was sold about this company. The reality is Philadelphia wasn't saying she was a delinquent. Only Southwest was. Well, that's a separate issue. It doesn't seem like it would be a big deal to just do a check to see if there's an agreement. Turn up the delinquency and then do a separate check. It's got to be minimal time to see if there's an agreement. It doesn't seem like that's a big deal at all. Well, I think that's – I would agree with that. If I may just address, Judge Jordan, your qualified immunity question, because I think it's very relevant here. I think the rationale of saucier in requiring that the court decide the underlying coverage issue before it determines willfulness is useful and applies here. The Supreme Court, of course, backtracked on that, and Pearson said, yeah, we're not going to make you do that anymore. So evidently even the Supreme Court doesn't think you've got to answer every question anymore, right? Well, they did backtrack by removing the mandate, but they didn't say it's not useful in cases. They said that it just shouldn't be required all of the time. But in a case like this where you can't assess the willfulness question without looking to see whether it's a close call – and it's not a close call here. I understand what's troubling the panel is what other companies might be covered by our decision. But the law says what it says. It's very broad. It's not just that it might affect other companies. And you glided over this pretty quickly, but it's that, as the district court said, there's an astonishing lack of authority on this. And it might be that that's just because the title-searching folks like Southwest are so superlatively secretive that they could replace the CIA. But maybe it's because this is a completely novel theory you're putting forth, and it's novel because it's got some aspects to it that ought to give us pause. Well, I would disagree with that premise because the theory's not novel, okay? The fact that this particular company that sells what it calls an incurrent ownery court hasn't been sued, that may not have happened before. But as this court noted in Cortez, the mere fact that a case hasn't been decided by a court of appeals doesn't give it a free pass on the willfulness finding. The question is, is the statute clear? And I have to say, if you're counseling Southwest on this, this is what we do. We sell this information, and it can impact credit eligibility decisions. Now let's look at the definition of the FCRA. Let's look at the definition. Are we covered? Wow. Employment background checks, covered. Landlords or companies which issue rental reports, covered. Companies which sell information to insurance companies, covered. Look at the breadth of this language to think and conclude this statute does not apply to us at all. That's really reckless. They drove right into the heart of the FCRA intersection here, without regard for whether its light was red. You can't look at these definitions and all of the cases that have determined whether a consumer report was generated or issued in a particular case and walk away saying this was a close call. It's not. The FCRA is very broad. As I said before, it is designed to allow consumers to be able to see and challenge information that's reported about them when it impacts their ability to get credit, insurance, or a job, or other things. That's what happened here. That's the facts of this case. And that was not followed in this case. And their decision to say, I'm not covered, as they said in their deposition, was a reckless one. Thank you. Thank you very much. A big matter in the advisory. I want to thank Mr. May and Mr. Johnson, both of you, for a very helpful argument.